UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

SYDNEY LEWIS,

                  Plaintiff,

        -v-

THE DEPOSITORY TRUST & CLEARING
CORPORATION, ALAN HUTTON, ANTHONY
PORTANNESE, NICHOLAS SCALZO,
MICHAEL LIPPA, RICHARD MERCKLING,
CHARLES ESPOSITO, CHRISTOPHER
AULETTI, THOMAS MCGUIRE, REEMA
MIRCHANDANI, and MICHAEL KILLELA,

                  Defendants.

-------------------------------------------------------------x

04 Civ. 4569 (GEL)

**OPINION AND ORDER**

Victor Essien, New York, NY, for plaintiff.

Frederic C. Leffler and Gershom R. Smith,
Proskauer Rose LLP, New York, NY, for
defendants.

GERARD E. LYNCH, District Judge:

      Defendants  in this employment discrimination case move for summary judgment under

Federal Rule of Civil Procedure 56(c) on all of plaintiff's claims.  The motion will be granted.

## BACKGROUND

I.  The Parties

      The Depository Trust & Clearing Corporation ("DTCC") is, according to the parties, "the

largest financial services post-trade infrastructure organization in the world," offering "clearance

settlement, custody and information services for equities, corporate and municipal debt, money

market instruments, American depository receipts, exchange-traded funds, insurance products and other securities." (D. Local R. 56.1 Statement ("D. 56.1 Statement") ¶ 1; P. Local R. 56.1 Counterstatement ("P. 56.1 Counterstatement") ¶ 1.) The organization "provides custody and asset servicing for more than two million securities issues worth trillions of dollars." (D. 56.1 Statement ¶ 1; P. 56.1 Counterstatement ¶ 1.) Defendants Hutton, Portannese, Scalzo, Lippa, Merckling, Esposito, Auletti, McGuire, Mirchandani and Killela (collectively with DTCC, "defendants") are employees of DTCC.

Plaintiff Sydney Lewis ("plaintiff" or "Lewis"), a black man of Jamaican origin, has been a DTCC employee since February 1979. In 1999, he was promoted from Senior Research Clerk to Supervisor of Aging Transfer, a department within DTCC's Operations Division. In January 2002, he became supervisor of the Troubleshooting Department, which is also within the Operations Division. (See D. Mem. in Support of Mot. for Summ. J. ("D. Mem.") at 7; P. Mem. in Opp. to Mot. for Summ. J. ("P. Mem.") at 3; Lewis Dep. 43:14-19, 60:2-3, 60:10-12; id. Ex. 25.)

II.     The Events at Issue

        A. Plaintiff's Initial Written Warning

        The events giving rise to this action began in November 2001, when plaintiff's superiors expressed dissatisfaction with certain evaluations plaintiff had drafted concerning his subordinates' job performance. According to defendants, plaintiff's superiors found discrepancies between the high ratings plaintiff had given the employees and plaintiff's written descriptions of their work; plaintiff was thus directed to provide more detailed descriptions to justify the high ratings or to adjust the ratings to a more appropriate level. (D. 56.1 Statement

2

¶¶ 13-14.)  Plaintiff, defendants contend, exerted little effort to address these concerns; he simply reduced the ratings without altering the descriptive appraisals, and then told his subordinates during improperly short interviews that "this is what managements deems you deserve."  (Id. ¶ 14 (citation and internal quotation marks omitted); see also D. Mem. at 8.)

Plaintiff's subordinates took issue with the edited evaluations and filed a complaint with DTCC's Human Resources Department, arguing that they had been treated unfairly and deserved higher ratings.  Their complaint, a copy of which appears in the record, was rife with direct attacks on plaintiff's character, claiming that Lewis lacked integrity, honesty, discipline, and credibility, and that he had destroyed his subordinates' "morale" and "sense of fair play." (Lewis Dep. Ex. 12.)  An investigation into the matter by plaintiff's superiors concluded that plaintiff had conducted the evaluations "improperly and poorly," that he had "demonstrated insubordinate behavior during the appraisal preparation process . . . by failing to provide [his] manager examples to support the performance ratings," and that he had failed to "act in good faith, on behalf of [his] employees, when [he] merely [lowered] the ratings on the appraisals." (Id. Ex. 13.)  Plaintiff was issued a "Written Warning" that "any further occurrences of this nature could result in further disciplinary action up to and including termination."  (Id.)

Plaintiff does not contest the above characterization of the investigation's conclusions, but argues that the discipline was unjustified.  According to plaintiff, he simply administered the evaluations in accordance with his supervisor's instructions, despite having been given insufficient time and inadequate guidance.  (P. 56.1 Counterstatement ¶¶ 13-14.)  He alleges that defendant Esposito, the manager of the Aging Transfer Department, "brusquely ordered [him] to make the ratings changes or risk being cited for insubordination."  (Id. ¶ 13; see also Lewis Dep.

3

51:8-12.)  Plaintiff also claims that he unsuccessfully pleaded with the department's director and
vice-president (defendants Lippa and Hutton) to intervene in the matter.  (P. 56.1
Counterstatement ¶ 14.)  When his subordinates later complained about their ratings, plaintiff
contends, "Esposito, Lippa and Hutton chose to use [plaintiff] as a scapegoat and close[d]
rank[s] against him."  (Id.)  Plaintiff concedes that the Written Warning played "an important
role" in future disciplinary action taken against him.  (D. 56.1 Statement ¶ 17; P. 56.1
Counterstatement ¶ 17.)

   B.  Plaintiff's Transfer and Final Warning

   Plaintiff's employment troubles continued the following year.  In January 2002, DTCC
instructed plaintiff and fellow supervisor Richard Merckling to switch positions, so that
Merckling would become a supervisor in the Aging Transfer Department, and plaintiff would
become a supervisor in the Reject Processing Department.  Both departments formed part of the
company's Operations Division.  (D. 56.1 Statement ¶ 19; P. 56.1 Counterstatement ¶ 19.)
According to plaintiff, his employers ordered the switch in position while plaintiff was on
vacation in an effort to better situate Merckling for promotion to a vacant managerial position.
(Id.; Complaint ¶ XI(c).)  Defendants claim that management transferred Lewis to the new
position "to expand the breadth of his knowledge and expertise."  (D. Mem. at 7.)

   Soon after the transfer took place, a dispute arose as to the proper procedure for dealing
with stock certificates confiscated by transfer agents.  For purposes of the present dispute, a
thorough understanding of the procedure in question is unnecessary.  It suffices to note that
according to defendants, the correct procedure "dictated that as soon as a transfer agent notified
DTCC that it had confiscated a stock certificate . . . , DTCC was immediately to debit the

4

participant's . . . account by the number of shares that had been confiscated." (D. 56.1 Statement ¶ 21.) In contrast, under the procedure established by plaintiff when he took over as supervisor of Reject Processing, confiscated certificates were placed in a special status called "Stop" or "STP" status, and participants' accounts were not adjusted unless the transfer agent first provided "replacement certificate numbers." (Id.; P. 56.1 Counterstatement ¶ 21; P. Mem. at 6-7.)

Plaintiff contends there was no uniform procedure in place to deal with confiscated certificates when he became supervisor of Reject Processing, and that he adopted the supposedly "new" procedure primarily "because it was the same procedure that his previous department followed." (Id. at 6; see also Lewis Dep. 120:5-15.) He claims that his superiors, including defendants McGuire and Lippa, initially approved of his actions. (Id. at 126:19-25.) According to defendants, however, plaintiff's actions constituted a unilateral and unjustified change in an important, "long-standing" procedure. (D. 56.1 Statement ¶ 21.) Plaintiff's preferred method, defendants argue, exposed both DTCC and its clients to financial risk. (Id. ¶ 22.)[1]

Regardless of whether plaintiff actually acted improperly, there is no dispute that his preferred procedure was ultimately rejected and that his superiors initiated an investigation into his conduct. Nor is there any dispute that plaintiff vigorously resisted defendants' efforts to discipline him for the allegedly unauthorized policy change. After being notified, for example,

---

[1] Defendants suggest that plaintiff's failure to follow proper procedure stemmed in part from his refusal to undergo training. They explain that Merckling and plaintiff spoke about training each other in their new positions, as their superiors had instructed them to do, but that plaintiff demurred, telling Merckling he knew the new department's procedures, and that the procedures were available on DTCC's computer system even if he did not. (D. 56.1 Statement ¶ 20.) Plaintiff concedes that he declined Merckling's offer for training despite their superiors' instructions. (P. 56.1 Counterstatement ¶ 20.)

that defendant Hutton was considering issuing a "final warning" to plaintiff for insubordination, plaintiff filed a formal complaint with DTCC's general counsel, denying that he had acted improperly and claiming that his superiors, particularly defendant McGuire, were "deliberately engaging in actions designed to bring harm to and ultimately destroy [his] professional career at DTCC." (Lewis Dep. Ex. 20 (emphasis added).)  Plaintiff's complaint charged McGuire with violating the Corporation's Code of Ethics, but did not specifically allege illegal discrimination of any kind. (Id.)

A July 15, 2002, memorandum to plaintiff from Larry Thompson, DTCC's Deputy General Counsel, informed plaintiff that DTCC had investigated his allegations and had concluded that he was "not subject to any conduct that violated DTCC's Equal Employment, Non-Discrimination & Anti-Harassment Policy, or DTCC's Code of Ethics." (Lewis Dep. Ex. 22.) Thompson, who is African-American (D. 56.1 Statement ¶ 43; P. 56.1 Counterstatement ¶ 43; Lewis Dep. 60-61), explained in the memorandum that plaintiff's actions with respect to the change in confiscation procedures were unjustified, and that plaintiff had acted unreasonably in response to his superiors' investigation of the matter, in part by adopting hyper-technical interpretations of the questions posed to him. (Id. Ex. 22.)

Shortly after plaintiff received notice that DTCC had rejected his complaint, the underlying investigation into plaintiff's conduct was concluded, and plaintiff received a "final warning" in a memorandum from defendant Hutton.[2] (Id. Ex. 17.)  Hutton's memorandum stated that plaintiff had exercised "poor judgement in ignoring information provided to [him] by staff

---

[2] Presumably due to a typographical error, the memorandum containing the final warning was dated July 22, *2003*, by its author.  However, a date stamp on the document, as well as other evidence in the record, clearly establish that the document was issued in July *2002*. (See Lewis Dep. 153:25 to 154:5, 171:20 to 172:5; id. Ex. 17.)

and colleagues"; that he had misled Hutton during the investigation of the incident, and that

plaintiff's actions, together with the previous written warning he received for insubordinate

behavior, "place[d] into serious question [plaintiff's] judgment, credibility, and ability to work as

part of the management team." (Lewis Dep. Ex. 17; Lewis Dep. 153:25 to 154:5.)  In a written

response, plaintiff alleged that "the events leading to this warning were designed to disqualify

[him] as a candidate" for a new managerial position for which he had recently and

unsuccessfully applied. (Lewis Dep. Ex. 17.)  Plaintiff did not, however, use any official

internal complaint procedures to challenge the final warning. (Lewis Dep. 173:4-8.)

    C. The Promotion of Merckling

    The position to which plaintiff referred in his written response was a managerial position

in the Fast Balancing/Aging Transfer Department.  On June 26, 2002, defendant Lippa, then

Director of Transfer Operations, chose defendant Merckling out of the fifteen applicants,

including plaintiff, who had sought the position.  (D. 56.1 Statement ¶¶ 38-40; P. 56.1

Counterstatement ¶¶ 38-40.)  Though plaintiff insists he was the most qualified candidate, there

is no dispute that Merckling had worked at DTCC three years longer than plaintiff; that

Merckling had become a supervisor nine years before plaintiff; and that Merckling had received

better overall ratings than Lewis in the three years prior to the promotion.  (Lewis Dep. 268:1-

21, 272:21 to 283:16; id. Exs. 18, 25.)  Plaintiff conceded at his deposition that it was

appropriate for his superiors to consider these factors in deciding whom to promote.  (Lewis

Dep. 268:1 to 269:12, 281:9-18.)  He has also conceded that at the time of the promotion, he had

received a written warning only seven months earlier and was still under investigation for

changes in Reject Processing procedures.  (D. 56.1 Statement ¶ 42; P. 56.1 Counterstatement

7

¶ 42.)  Though plaintiff, unlike Merckling, had a college degree, the job posting for the

management position specifically indicated that a college degree was not necessary if the

applicant had "equivalent industry experience."  (Merckling Dep. Ex. 1.)  Plaintiff now contends

that the failure to promote him was discriminatory and that "Merckling, like most caucasians,

enjoys preferential treatment at DTCC."  (P. Mem. at 7.)

D.  Plaintiff's "Requires Improvement" Rating

On January 31, 2003, plaintiff received his 2002 Performance Appraisal, which covered

the period from January through December 2002.  Though he received a "Fully Competent"

rating in the "Goals" category, he received a "Requires Improvement" rating in the categories of

"Integrity & Trust," "Teamwork," "Communicates Effectively," and "Overall Values and

Competencies."  (D. 56.1 Statement ¶¶ 45-46; P. 56.1 Counterstatement ¶¶ 45-46.)  In the

comments section of the appraisal, plaintiff's manager, defendant McGuire, wrote: "During the

evaluation period there were situations where performance clearly did not meet expectations, and

this includes behavior that resulted in the administration of a final warning.  [Lewis] has been

cited during the review period for using poor judgment, lack of cooperation with his

management team and misleading management."  (D. 56.1 Statement ¶ 47; P. 56.1

Counterstatement ¶ 47; Lewis Dep. Ex. 23.)  Lewis attached a rebuttal to the appraisal, which

attacked McGuire's fairness and judgment but did not allege discrimination on the basis of race

or national origin.  (D. 56.1 Statement ¶ 49; P. 56.1 Counterstatement ¶ 49; Lewis Dep. Ex. 23.)

Plaintiff also complained to Charles Smith — an African-American and DTCC's Group Director

of Employee and Labor Relations (D. 56.1 Statement ¶ 43; P. 56.1 Counterstatement ¶ 43; Lewis

Dep. 69-70) — that the negative appraisal was unfair.  He later received a memorandum from

8

Smith stating that there was no evidence that McGuire had violated any DTCC policies in completing plaintiff's appraisal, and that "the categories [Lewis] received *Requires Improvement* ratings in cannot be disputed." (Id. Ex. 24; D. 56.1 Statement ¶¶ 52-55; P. 56.1 Counterstatement ¶¶ 52-55.)

As a result of the Requires Improvement rating, plaintiff was ineligible for a merit increase in his compensation that year, though he later received merit increases when his appraisal ratings improved. (D. 56.1 Statement ¶ 57; P. 56.1 Counterstatement ¶ 57; Lewis Dep. 178:8-19, 327:15 to 328:15.)[3] The Requires Improvement rating also rendered plaintiff ineligible for an in-house leadership training program, the "Six Sigma Green Belt Certification Program." (Id. Ex. 37.) Plaintiff's application to the program was thus rejected, but he was informed that he would be eligible in the future if his performance improved. (D. 56.1 Statement ¶¶ 68-72; P. 56.1 Counterstatement ¶¶ 68-72; Lewis Dep. Exs. 37, 40.)[4] In plaintiff's view, he should have been admitted immediately to the program, because his manager initially supported his application, and because his Requires Improvement ratings had been unjustified. (P. 56.1 Counterstatement ¶ 69.)

E. The Allegation of Sexual Harassment

In an incident which defendants claim is unconnected to the above described events, but which plaintiff describes as integral to his hostile work environment claim, plaintiff was charged

---

[3] Plaintiff does not allege discrimination with respect to merit increases in any year except 2003, and he does not allege discrimination with respect to bonuses in any year, including 2003. (D. 56.1 Statement ¶ 10; P. 56.1 Counterstatement ¶ 10.)

[4] Plaintiff concedes that eight of the twenty employees selected for the program were persons of color, including two black men and two black women, and that defendant McGuire personally approved the application of at least one of the black employees. (D. 56.1 Statement ¶ 74; P 56.1 Counterstatement ¶ 74.)

9

with sexual harassment of a fellow DTCC employee.  According to Reema Mirchandani, plaintiff approached her several times at her desk in the fall of 2002 and made inappropriate comments and gestures.  Mirchandani testified, for example, that Lewis informed her that he felt sick and asked her if she could "play a doctor and take care of him."  (Mirchandani Dep. 19:19 to 21:7; see D. 56.1 Statement ¶ 58.)  Mirchandani says she reported the incident to defendant Auletti, who reported the incident to Human Resources.  (Mirchandani Dep. 24:13-14.)

An investigation into the matter cleared plaintiff of any wrongdoing under DTCC's policies.  Moreover, Deputy General Counsel Thompson later noted in a memorandum that the incident "suggest[ed] an all too aggressive effort to incriminate Mr. Lewis."  (Essien Dec. Ex. E.)  Thompson concluded, however, that no action was warranted to discipline Mirchandani, because the evidence did not support an allegation that she had "fabricated the entire matter."  (Id.)  Plaintiff claims that the failure to discipline Mirchandani invited other employees to abuse him by sending the message that he was a "free meal."  (Lewis Dep. 313:24-25.)

F.  Plaintiff's Lawsuit

On June 24, 2003, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, which issued a Notice of Right to Sue on March 31, 2004.  (Lewis Dep. Ex. 1.)  A letter from the EEOC accompanying the Notice informed plaintiff that the EEOC's investigation found no evidence that the actions of which plaintiff complained were related to his race or national origin.

In the complaint filed in this Court on June 17, 2004, plaintiff alleges that defendants "acted to create and maintain a hostile work environment for the plaintiff, because of his racial and national origin," in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

10

et seq. (Complaint ¶ XI.) In support of this allegation, plaintiff cites the written and final warnings, as well as his negative job appraisal. (Id.) He also cites defendants' failure to promote him, to admit him to the training program, and to take disciplinary action against Mirchandani. (Id.) The complaint alleges that there is a "pattern and practice of restricting the promotion or advancement opportunities of blacks in DTCC." (Id. at XI(c).)

After the completion of discovery, defendants filed the instant motion for summary judgment on October 31, 2005.

## DISCUSSION

I. Defendants' Procedural Objections

Defendants' opening brief launches a series of procedural attacks on plaintiff's complaint, arguing, inter alia, that plaintiff's claims are barred in part by the statute of limitations, see 42 U.S.C. § 2000e-5(e)(1); that summary judgment is warranted for defendants because plaintiff failed to make use of DTCC's internal remedies, see Faragher v. City of Boca Raton, 524 U.S. 775 (1998); and that the individual defendants are immune from liability under Title VII, see Wrighten v. Glowski, 232 F.3d 119, 119 (2d Cir. 2000) ("[I]ndividuals are not subject to liability under Title VII.").[5] Though several of defendants' procedural arguments

---

[5] But see Hafez v. Avis Rent A Car Sys., Inc., 242 F.3d 365, 2000 WL 1775508, at *2 (2d Cir. Nov. 29, 2000) (unpublished opinion) (noting that the Second Circuit has "not yet determined whether Title VII allows suit against individual employees in their official capacities"). This Court has held, in the context of the Age Discrimination in Employment Act, that individual supervisors may not be named as defendants in their official capacities. See Tishman v. Associated Press, 05 Civ. 4278 (GEL), 2005 WL 3466022, at *2-*3 (S.D.N.Y. Dec. 16, 2005).

11

appear to have merit and would likely justify the granting, in part, of defendants' motion for summary judgment, it is unnecessary for the Court to address these issues in depth, because even assuming, arguendo, that all of plaintiff's claims could survive defendants' procedural objections, the record makes abundantly clear that plaintiff's claims fail in every respect on the merits. Thus, without ruling on defendants' procedural arguments, the Court will proceed directly to an analysis of plaintiff's underlying substantive claims.

## II.  Summary Judgment Standard

Summary judgment is warranted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden to establish the absence of any material factual issues. Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003), citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "In determining whether there are genuine issues of material fact," the Court must "resolve all ambiguities and draw all permissible factual inferences" in favor of the non-moving party. Id. (citation and internal quotation marks omitted).

## III.  Plaintiff's Hostile Work Environment Claim

The complaint alleges that defendants violated Title VII by creating and maintaining a hostile work environment on the basis of plaintiff's race and national origin. To prevail on this theory, plaintiff must produce evidence that "'the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"

12

Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006), quoting Harris v. Forklift Sys., Inc., 510
U.S. 17, 21 (1993); see Fairbrother v. Morrison, 412 F.3d 39, 48, 50 (2d. Cir. 2005).  Factors to
consider when determining whether an environment is "hostile" for purposes of Title VII are
"'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or
humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an
employee's work performance.'" Terry, 336 F.3d at 148, quoting Harris, 510 U.S. at 23.
Isolated incidents typically will not suffice to demonstrate a hostile work environment unless
they are sufficiently severe as to "'alter the terms and conditions of employment.'" Demoret,
451 F.3d at 149, quoting Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004).
"Generally, 'incidents must be more than episodic; they must be sufficiently continuous and
concerted in order to be deemed pervasive.'" Id., quoting Alfano v. Costello, 294 F.3d 365, 374
(2d Cir. 2002).

 Though the standard for establishing a hostile work environment is thus very high, the
Second Circuit has cautioned against setting the bar *too* high, noting, for example, that the
environment need not be "unendurable" or "intolerable" to support a hostile work environment
claim. Terry, 336 F.3d at 148 (citation and internal quotation marks omitted).  "In short, the fact
that the law requires harassment to be severe or pervasive before it can be actionable does not
mean that employers are free from liability in all but the most egregious cases.'" Id. (citation
and internal quotation marks omitted).

 Applying these principles here, there is no genuine issue as to the fact that plaintiff did
not experience a hostile work environment, because plaintiff offers no evidence suggesting that
he suffered any intimidation, ridicule, insult, or other abuse on account of his race or national

origin. See Demoret, 451 F.3d at 149 (noting that a plaintiff alleging a hostile work environment must demonstrate the existence of "'*discriminatory* intimidation, ridicule, and insult'" (emphasis added), quoting Harris, 510 U.S. at 21).

Moreover, even if there were evidence to support the allegation that the various adverse employment actions taken against plaintiff constituted race-based or national-origin-based abuse, there would still be insufficient evidence to suggest that the adverse actions were sufficiently frequent or severe to meet the high standard for hostile work environment claims under governing case law.  Plaintiff presents no evidence that his day-to-day work environment was permeated by insult or ridicule of any kind.  Rather, his complaint essentially objects to several quite discrete and specific instances in which he was subject to formal discipline or evaluation. Accordingly, insofar as plaintiff rests his Title VII claim on a hostile work environment theory, defendants are entitled to judgment as a matter of law.

IV.  Plaintiff's Disparate Treatment Claim

Though plaintiff's complaint is primarily cast as a claim of hostile work environment, it is clear that he intends also to bring a disparate treatment claim under Title VII.  See United States v. City of New York, 359 F.3d 83, 91 (2d Cir. 2004) ("Complaints alleging civil rights violations must be construed especially liberally.").  To establish a claim of disparate treatment, plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discriminatory intent.  Terry, 336 F.3d. at 137-38, citing Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir.2002); see also Demoret, 451 F.3d at 151.  Circumstances contributing to an inference of discriminatory intent

14

may include, inter alia, an employer's criticism of either the plaintiff's or other employees' work "in ethnically degrading terms," "invidious comments" about members of the protected class to which plaintiff belongs, and/or more favorable treatment of employees not in plaintiff's protected class.  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

 Once a plaintiff establishes a prima facie case, the defendant must articulate a "legitimate, non-discriminatory" reason for its actions.  Terry, 336 F.3d at 138; see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the defendant does so, the burden shifts back to the plaintiff to show that the employer's proffered reason is pretextual.  Demoret, 451 F.3d at 151.  At the summary judgment stage, this requires plaintiff to cite "admissible evidence [showing] circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  Terry, 336 F.3d at 138 (citation and internal quotation marks omitted).

 Because an employer's intent is ordinarily an issue in Title VII cases, the Second Circuit has instructed district courts to be "especially chary in handing out summary judgment in discrimination cases."  Chertkova v. Conn. Gen. Life Ins., 92 F.3d 81, 87 (2d Cir. 1996); see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000).  This is not to say, however, that plaintiffs may avoid summary judgment "by simply declaring that state of mind is at issue." Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61-62 (2d Cir. 1998); see also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.").  As in other contexts, the "plaintiff must still offer concrete evidence from

15

which a reasonable juror could return a verdict in [his or her] favor." Distasio, 157 F.3d at 62 (citation and internal quotation marks omitted).

Defendants in the instant case argue that plaintiff has failed to state a prima facie case of discrimination. The Court agrees, as plaintiff has not offered a shred of evidence that could give rise to a reasonable inference of discriminatory intent. See Phillips v. Chertoff, 03 Civ. 4266 (GEL), 2005 WL 3466033, at *5 (S.D.N.Y. Dec. 16, 2005) ("Although the burden of establishing a prima facie case is indeed minimal, it is not totally illusory; the plaintiff must point to *some* circumstance that permits an inference of discrimination." (citation omitted)). While plaintiff disputes the merits of the disciplinary actions taken against him, he presents nothing that indicates a racial or ethnic animus against him. Indeed, in vigorously contesting the merits of these actions within the company, he never suggested that his difficulties were the result of any sort of illegal bias or discrimination.

Even assuming, however, that plaintiff meets the minimal burden of establishing a prima facie case, the defendants have, as described supra, articulated — and provided substantial evidence of — legitimate non-discriminatory reasons for every adverse action taken against plaintiff. Plaintiff has failed to respond with any evidence from which "a rational finder of fact [could] infer that the defendant[s'] employment decision[s] [were] more likely than not based in whole or in part on discrimination." Terry, 336 F.3d at 138 (citation and internal quotation marks omitted).

Defendants have provided evidence, for example, that both the initial written warning and the final warning were issued due to plaintiff's insubordination (see, e.g., Lewis Dep. Exs. 13, 15, 17, 22); that the negative appraisals were based on plaintiff's disciplinary record (see,

16

e.g., id. Ex. 23); and that exclusion from the training program was based on the negative
appraisals (see, e.g., id. Ex. 37).  The decision to promote Merckling instead of plaintiff,
moreover, is supported not only by plaintiff's insubordination, but by Merckling's superior
appraisals and more extended experience with the company.  (Lewis Dep. 268:1-21, 272:21 to
283:16; id. Exs. 18, 25.)  Plaintiff was cleared of the sexual harassment charge after an internal
investigation by company officials, and no action was taken against him; even if one adopts the
dubious assumption that defendants' decision not to discipline Mirchandani constitutes an
"adverse employment action" against plaintiff, defendants persuasively argue that the decision
was nevertheless justified by the absence of evidence that Mirchandani acted in bad faith, and by
the fact that defendants would risk Title VII liability if they retaliated against her for
complaining of sexual harassment.  (D. Mem. 30-31; see also Essien Dec. Ex. E.)

     Plaintiff offers no evidence that discriminatory motives played a role in any of these
actions.  Resolving all ambiguities and drawing all possible reasonable inferences in plaintiff's
favor, the evidence *might* allow a rational fact finder to conclude that plaintiff was treated
unfairly; that he was disciplined in error; and that some DTCC employees, including some of
plaintiff's superiors, disliked plaintiff and allowed their adverse feelings to affect their decision-
making.  (See, e.g., Lewis Dep. 98:2 to 99:25, 118:2 to 120:24, 256; id. Ex. 22; Essien Dec. Ex.
E.)  This is insufficient, however, to establish liability under Title VII.  Cf. Brummett v. Lee
Enters., Inc., 284 F.3d 742, 745 n.1 (7th Cir. 2002) ("It is not enough that [plaintiff] is African
American, was disliked, and was fired; he must present some evidence, direct or indirect, that he
was fired because of his race.").[6]

_____

    [6] Racial prejudice, of course, may play a subtle and/or hidden role in shaping what appear
on the surface to be race-neutral social judgments.  This is one reason why courts should be

17

Plaintiff's brief in opposition to summary judgment makes a half-hearted attempt to set forth the issues of fact that require a trial, but fails to support the conclusory charges of discriminatory motivation with any citations to the record. Plaintiff claims, for example, that when his subordinates complained about their poor appraisals, "the Manager and the Director in typical clannish fashion closed ranks and threw the Plaintiff to the dogs." (P. Mem. at 13.) Even assuming this is true, plaintiff does not cite any evidence that plaintiff was thrown "to the dogs" on account of his race or national origin. Plaintiff further claims that the "Vice President . . . saw this as an opportunity to issue the Plaintiff with an unwarranted written warning, one of the weapons that the members of the non-protected group in positions of power use to keep the members of the protected group in line." (Id.) Again, there is no mention of any evidence that might support plaintiff's allegations of discriminatory motive. On the issue of the sexual harassment charge, plaintiff explains that he "sees the fact that no sanctions were visited on the mischievous employees as proof that [defendants] will protect those that harass the Plaintiff and his kind." (Id.) It is of course insufficient, however, for plaintiff to allege that he "sees" the lack of sanctions as discriminatory; in the absence of any evidence, plaintiff's subjective perceptions are irrelevant for purposes of determining whether there is a genuine issue of material fact.

In sum, there is no genuine issue of material fact as to whether defendants took adverse employment action against plaintiff on account of his race or national origin, as plaintiff offers

---

reluctant to dismiss discrimination claims at the summary judgment stage. See Chertkova, 92 F.3d at 87. Here, however, under any reasonable reading of the evidence, there is simply no sufficient basis for finding that racial animus infected defendants' decision-making. See Distasio, 157 F.3d 55 at 61-62 (noting that while "[s]ummary judgment should be used sparingly when . . . state of mind or intent [is] at issue, . . . plaintiff must still offer concrete evidence from which a reasonable juror could return a verdict in [his or her] favor" (citation and internal quotation marks omitted)).

nothing more than conclusory assertions to support his allegations of discriminatory motive. Accordingly, defendants are entitled to judgment as a matter of law on plaintiff's Title VII disparate treatment claim.

V.  Plaintiff's Pattern and Practice Claim

For the same reasons, defendants are also entitled to summary judgment on plaintiff's claim of a pattern and practice of discrimination.  A Title VII plaintiff alleging a discriminatory pattern and practice "must produce sufficient evidence to establish a prima facie case of a policy, pattern, or practice of intentional discrimination against the protected group." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 158 (2d Cir. 2001).  This is normally done by producing statistical evidence regarding defendant's past treatment of the protected group, and/or by producing testimony from protected class members detailing specific instances of discrimination.  Id.  As discussed above, plaintiff has not produced evidence of this or any other kind suggesting discrimination on the basis of race or national origin.  Indeed, plaintiff presents no evidence relating to the circumstances of any African-American or Jamaican employees other than himself.

The only evidence in the record regarding other black employees reflects that there are several African-Americans in managerial or other high-level positions (including Larry Thompson, Charles Smith, Glynnis Aquino, and Pat Mobley) (Lewis Dep. 69-70), and that several African-Americans were admitted to the leadership training program (D. 56.1 Statement ¶ 74; P. 56.1 Counterstatement ¶ 74).  The record also reflects the generally successful career of plaintiff, who has worked at DTCC for over 25 years, been promoted to supervisory positions,

and received regular increases and bonuses; plaintiff complains of mistreatment in only a handful of matters over a short period of time during his long career.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted, and plaintiff's complaint is dismissed.

SO ORDERED.

Dated:      New York, New York
            August 29, 2006

                                        _____
                                        GERARD E. LYNCH
                                        United States District Judge

20